Matter No. 181065 Teamsters Union 25 Health Services and Insurance Plan et al. v. Warner Chilcott Limited et al. Good morning, Your Honors. Mr. Gidley, good morning. I would like to reserve Your Honors three minutes for rebuttal. You may have it. Thank you. Your Honor, Mark Gidley for the Warner defendants. This is a 23-F appeal from class certification. The District Court aired in this case, the Asa Call case, on two issues, standing and 23-B-3 predominance. I'll briefly touch on standing. This is a case where if you look at the complaint in paragraph 208, the plaintiffs are suing as indirect purchasers. They're not able to sue as direct purchasers under Illinois Brick, under 26 state laws and the laws of the District of Columbia. But despite the pleading that they have to have purchases in those 26 jurisdictions, they have purchases in at most four jurisdictions. So the class representatives, and that's what we're talking about here, the class representatives have purchases only in those four states. That is not sufficient for Article III standing. On 23-B-3 predominance, we start first with the mismatch here between the damages and the liability case. The liability case is an amended hard switch, old Asa Call over to new Asa Call. And it's admitted that the way this class works, if an insurance company has a claim of a new prescription, that is post-switch, it's in the damages period. So that's an unswitched consumer. Meanwhile, a consumer, to be in the damages pot, and the pot splits about 20% consumers, 80% insurance companies. A consumer has to buy before the switch and after the switch. But the insurer gets the four prescriptions that no consumer would be allowed to claim for under Dr. Conte's model. So Dr. Conte's treatment, which is following the class definition, reveals how there is a greater amount of damages of persons who are not injured. Second, the way the Conte model works and the way the class certification works here, there are also persons who took Asa Call in 2009 or 2010 and stopped. And they were not taking it in December 2012, January, February, March of 2013 when the change to Delsa Call, the DBP-free version, came out. Yet they're also in the class damages and meet the class definition. Again, that's a separate Comcast problem. So the court's suggestion below seemed to be that it agreed with you that there are uninjured members in the class, as I read the district court decision. But it said it would take care of that through some process, affidavits or claim forms. If you could fast forward for us and describe to us how the trial would go. Have you agreed to waive any objections based on hearsay to the submission of claim forms or affidavits? Absolutely not. So if they file an affidavit, are you going to contest it? How would you contest an affidavit from a consumer saying, I did all the things that are necessary to establish injury in fact? I think it would be hard to contest it in a way that a 7th Amendment civil jury trial would work, where we'd have experts or fact witnesses or even just an adversarial process under oath. I think it's a stack of affidavits that come into a claims administrator. We might not even be present, whether we'd have the right to see them, but we certainly couldn't interrogate the individuals. Are you talking about trial or are you talking about in the claims process? Claims administration. Judge Conrad's question was trial. I'm sorry if I misunderstood. At trial, we are left with Dr. Conte because the trial would proceed on the presumption that there was a sufficient identity of common issues that Dr. Conte could use her common methodology. Her biggest problem is that Dr. Conte does no surveys, no econometrics. She did nothing to identify the common preferences. So she testifies, there are ways to measure consumer preference. I didn't do them. And this is different than NXIVM. Well, take the named plaintiff, one of them. If that person appears at trial, how are they going to establish injury? So there are four labor union plaintiffs. There are no consumer class representatives that are going to come to trial. Well, take consumer A, who's first on the list of class members. So insurance company A, let's take Wisconsin. My memory of the facts is as follows. Wisconsin would come, say we bought Asacol. Then we bought Delzacol. We bought HD, one of the other Asacol franchise products. And then we would cross-examine. We would draw out that, for instance, some of the class representatives actually cut off because they're insurance companies. They cut off the Asacol franchise products and went to Lealda and Apprezo. That's what leads our opponents in the red brief to shift their theory of liability away from Namenda. I want to make sure I'm responsive to your question, but I think one of the reasons why you don't see in the red brief a full-throated defense of Namenda is because they don't have a way to defend the fact that unlike NXIVM, where it's binary brand to generic, here it's brand to HD, 800 milligram, brand to Delzacol, DBP-free, get rid of the safety problem, brand to Lealda or Asacol. So that problem, the fact that she doesn't do any work, means that at the trial that we were scheduled before this court granted the 23F petition, the trial that we would have, we would have just those four union plans. We'd have to make our points to the jury in common. And then we have the cross-examination of Dr. Conte. We can draw out that she didn't do a survey. We can draw out that she didn't do any econometrics. But it's a legal question, what her concessions mean. And if you look at Wal-Mart, if you look at Comcast, if you look at rail freight, there's no factual question for the court. It's the concession of the expert witness. In Wal-Mart, at least, we're talking about the defendant's behavior. Here we're talking about the likely behavior, predictive behavior of a very speculative question, which is what the plaintiff would do. And I'm just wondering what authority you have, because there's an obvious difficulty in these consumer cases, which is the consumers, particularly in a case like this, we may have predictive judgment about what they would do if a product that does not exist was present. And one way of responding to that difficulty is along the lines you're pushing, which is, well, it's got to be highly individualized then, because we have to know what you would do. Another way of thinking about it is it's so speculative that a better means of proof of that is a statistical study about what likely consumer behavior is in the face of a choice about a lower product that's a bio equivalent to something else. And if you want to then go before the jury and say that study's got all these problems, that's fine. But why isn't it for a jury to just review that study and make its assessment of its worth, and then that's how we can resolve it? I think you've got two points that I'd like to address in your question, so we'll go to the authority second on the facts. There is no statistical work here. There's no survey. There's no econometrics. One can imagine that. Second... Just so I understand, is the case appreciably different if this expert did a sample of 700 consumers? I think the problem is that the choice normally... Yes or no on that one? I would say yes, that it's going to be hard and possible to do it individually, but I'd like to elaborate for a second. That was not my question. Okay, let me try again. Is the value of this common means of proof by the expert appreciably different in your view if the expert bases their assessment of the probability of a consumer making the choice to purchase the lower-priced bioequivalent? If that is based on a survey of a sample of consumers? I think that it can be a basis in some cases. I think it would fail here. The reason why it may work in some cases is the choice may be binary just between a brand and a cheap generic. That's Nexium. Here, where they went, and we have market research in the record... Let's just stop there. I'm saying, why would the survey data change your answer? Well, I think the survey data could at least answer the Comcast portion. I don't know that it would ever answer the Walmart problem. On Comcast, you could shrink the damages down to something that's getting closer... I'm just trying to figure out whether it's a common means of proof of liability. Okay. So in Tyson, they used... How long does it take people to put their clothes on? Right. No one knows. No one can remember. I don't remember. Okay? The expert comes in. He has no idea how long it actually took any person to put their clothes on. Joe's really slow. If he's like my son, he's slower than Joe. Right? My son would be slower. So it could be all kinds of different variations of people. We're not going to talk about that. I think that the expert come in and testify that I did a study, and I observed how long it took some people to put on their clothes, and I'm going to just say probably that means it took that long for each of these people. It has to be wrong. Right? But it's possible. The court there says that's enough. So I guess my question here is why isn't a similar type of thing happening? It may not be something the jury will believe, but why isn't it a common means of proof? Well, I think maybe the answer is Wal-Mart, right? So in Wal-Mart, the question is whether stereotypical thinking is leading to race-based employment decisions, and the court's looking at the statistical and econometric evidence, but the expert admits the stereotypical thinking crept into something like 0.5% to 95% of the decisions. I think Wal-Mart might have been decided differently if the band was 2%. Try something concrete. Okay, expert does a statistical study, determines beyond five standard deviations, 100% of the plaintiffs all did the things necessary and suffered injury. That probably suffice, I would think, to get any plaintiff to trial. But suppose you have an expert who says, after a statistical study, 51%, there's a 51% probability, greater than even, does that mean 100% of the class members win? Presumably it doesn't. If it doesn't, which of the 51% wins doesn't tell you anything about them. Right. So then what do you do if you go to 99%? Right. I think at some point, right, you say, we have enough confidence that it both meets what the rules are allowed to do without being substantive, right, under the Rules Enabling Act, and it would otherwise suffice under due process grounds. I think kind of the summary I would make on the colloquy we've had is that doing surveys in econometrics, which weren't done here, like if you look at the record, SA2496, market research, four months after the switch, that's the one-third went to HD. That might shoot the damages class, Your Honor, but that doesn't answer finding the individual. If we have a study, I think it's key in the case. One possibility is a study that my study suggests 100% of the people behave this way. Obviously there's a chance I'm wrong. Another study is there's a 51% chance it'll happen, right, same level of chance that I'm wrong about that. It seems problematic to say you could win your case. You could even survive a directed verdict or just based on a study that says 51%. It seems that you probably could win your case, even though you might not be entitled to summary judgment, if you have an expert saying 100% of the people do this. Can you win your case if you have an expert saying 99% of the people do this? I think you probably do it 99%. So then why not 92%? Well, I think all of these cases are line-drawing exercises, of course. But the point I would make to the court that I think maybe I haven't gotten across is the normal reverse payment case is binary between a brand and a generic. The choice here was quaternary between a brand, a second brand, HD, a third brand, Delzacol, DBP-free, with a lurking safety issue, and then finally a bunch of brand drugs. And you know that this is wrong. You know you have to reverse when you see the red brief abandoned amendment, the theory of this case in paragraph 47. When you say you would probably win at 99%, do you mean you, the defendant, or the plaintiff would win at 99%? And then how would that ñ which 99% of the class members would be the winners? I think that 99% confidence or 100% confidence may not be a good thing. I don't mean the degree of confidence. I think Judge Barron's question is that the expert testimony says 99% of the class members were injured, 1% were not injured. I think that's what he means, not a 99% confidence that 100% were injured. If we put Nexium to one side for a minute, do you lose? Well, I think that the de minimis test would probably come in right around where Will Freed says, 5%, 6%. Vista was 5% plus. But we're at 10% and they're attacking that factual finding here. We think it's 10% plus because the 10% that are uninjured, we're at 10% from Judge Casper. We think it's higher because of the two problems that you described. You're confusing two different things. There's the question of whether someone is uninjured and there's the question of whether we have a common means of proof that's admissible. Okay? Those are distinct. Yes. So the question Judge Cavan is pressing on, and I'm asking, is do we have an admissible common means of proof? There is an admissible means of proof, but it seems not common, which is every individual person will testify as to what they would do in that situation. Okay? That's admissible. It is probably very hard to attack. They have the problem that it doesn't happen to be a common means of proof. The common means of proof they have is a study, and the study suggests 92% of the people will behave a certain way. And the suggestion is that's a probabilistic determination, which is sufficient in the absence of any rebuttal as to a particular person's behavior, that that person likely would have purchased the generic. And the question is, is that an admissible basis for a finding of liability? Even in a single trial. Imagine just one person, and they bring their claim, and they say, what would you do? They say, you know what, I never tell a lie. I couldn't tell you for sure what I'd do. But I have an expert who says almost everybody will buy the generic. Can that plaintiff win? On one plaintiff case, 92% might win. The problem I've had with the questions is there's nothing in the record like that. The record evidence is of generic entry curves that are binary, just brand versus generic. We don't have binary choice behavior here. We have consumer preference behavior that the experts admitted she does not know how to model and she did not do the work. So I've been answering these questions on a hypothetical basis, Your Honor. Mr. Gidley, before you sit down, the assumptions are that national modeling either works or it doesn't work. But in the Article III portion of your attack, you make the point that different states have different sets of requirements under state law since these are all indirect purchasers. I don't know if you're continuing to argue under the class issues that national modeling in and of itself may have some flaws because consumer behavior in various different regions of the country that may be linked by common antitrust concepts are a better form of modeling and that wasn't even attempted here. If I understand your question, I'm not arguing that in this disease state ulcerative colitis that there are regional differences in the way people take the drugs. The Article III argument would be even if the state statutes were all the same, you need to have a class rep for each claim, Supreme Court law on that. But I hope I have addressed your question. Yes, thank you. Thank you, Your Honor. May it please the Court, Justin Malloy from Luxor Laws on behalf of the plaintiff's colleagues. Could you lift your mic up higher so I can hear you? Sorry, Your Honor. Is that better? Yeah. I'll start with Article III standing. The named plaintiffs in this case have Article III standing under the familiar triad. That's undisputed. And with that established, the question of the named plaintiff's scope of representation is a class certification question. It is not an Article III constitutional subject matter jurisdiction question. And the District Court got this exactly right. There's one claim at issue in this case, and it's monopolization. That claim arises under 26 state statutes for the named plaintiffs and the certified class members. But every one of those statutes recognizes that satisfaction of the monopolization elements satisfies liability. But you're not seeking redress under any but four of the states, right? For the named plaintiffs, that's exactly right, Your Honor. So how does the named plaintiff satisfy redressability as you have the 22? And I think, Your Honor, that's where they're complaining statutory standing with Article III standing. I thought redressability is part of Article III standing. It is, Your Honor. So how can you satisfy redressability as to those other 22? I don't believe that's a requirement, Your Honor. Why not? Because I think that the law from SOSNA shows that once the named plaintiff shows standing themselves for their claim that's being invoked on their behalf, which we have here. So they have Article III standing under the familiar triad. So is the theory that they have Article III standing to seek certification once they have Article III standing? I think the theory is once they have Article III standing triad as well as statutory standing and prudential standing for the statutes that are being invoked on their own behalf, the question of whether or not they can represent class members whose same claim arises under other statutes, that is a Rule 23. And my question is what is the Article III basis for them seeking certification? I think that what they're doing, they're seeking certification on behalf of claims they are not seeking to themselves get redress for. So how do they have Article III standing to do that? Is it that they have Article III standing to seek the certification, whereas the redress would be the certification of the class they're seeking to represent? I think the redress, analyzing what redress they can obtain, is looking to the statutes that apply to their specific claim. So redress for Teamsters, in this case, looks to the statutes that apply, the redress from the statutes that will apply actually to Teamsters' claim. Do you think the Supreme Court has resolved this issue? I do not, Your Honor. I do not think that there is a case that is directly on point for this issue as it applies to state statutes. You all may have a lot of litigation ahead of you. I hope not, Your Honor, but I expect that you may be right. So as for the Article III points, I think it's important that unlike many of the cases that they have cited, here there is a perfect alignment of incentives and identity of issues between the named plaintiffs and the class members. There is the same injury, same misconduct, same defendant, same relief sought, monetary damages, from the same theory of liability, and it will use the same common evidence at trial. And I do think that distinguishes this specific state law context where you have one theory of liability arising under several state statutes because of choice of law principles from many of the other standing cases. Moving from Article III, my colleague talked a lot about Comcast and a lot about the predominance issues here. There is no Comcast problem in this case. Our damages methodology matches our theory of liability, which is the parts which product up, and contours of our class. They have couched this criticism as a Comcast problem, but it's a merits dispute. They disagree with our damages total. They disagree with some of our inputs. But Judge Casper in this case analyzed and rejected their Daubert motion against Dr. Conti, our economist. She found that our damages methodology was reliable. Now under those circumstances, Tyson, Supreme Court, says that this type of dispute is almost the near-exclusive province of the jury. And we believe that those merits should go to the jury to decide whether or not this criticism has any merit. Well, could you go ahead, Judge. Judge Casper approved certification based on your proposal to have a claims administration process where class members would be required to submit affidavits rather than individual evidence just so that they would be injured, and it would also be protective of defendant's Seventh Amendment and due process rights. Could you tell me how that will go at trial? How is that going to work? Yes, Your Honor. So I think that what we would propose is first, at trial itself, the evidence, the common evidence that will be put on to prove class-wide injury, all or virtually all class members were injured, is Dr. Conti's work. But time out. That wasn't how you got class certification granted by Judge Casper. She did it based on your proposal to use affidavits, not to use Conti's testimony. Affidavits at the claims allocation stage post-verdict, Your Honor. So we have the model trial plan that she looked at and that we submitted with class certification. There's two different stages and two different presentations of evidence or I guess stages of the litigation here. The first is what we put on at trial to prove class-wide injury with common evidence. That's Dr. Conti as well as evidence from defendants themselves, evidence from their CEO that says we have class-wide injury. Then a verdict, assuming we won, Your Honor, then we would go into the claims allocation stage, and it's at that stage, because we would have already proven by verdict through the jury that there was class-wide or almost all, virtually all, the class was injured. Someone said virtually all. She said based on her review of the expert testimony, 10% were uninjured. Right. So putting aside any challenge to that number, which we do think it's less than that, we don't think it's dispositive of the case here either way. Assuming you just say it's 10%, then at the claims allocation stage, we have an aggregate damages award, and all the plaintiffs, individual plaintiffs, class members that would come in to make a claim to that individual can go to Judge Barron's questions. Suppose you were just trying a case for one of these plaintiffs, but the plaintiff refused to testify at trial about whether she was injured or not. So you put on Dr. Conti, and he says 90% of the people would have switched and done what's necessary to be injured. Can you get to a jury based on that testimony? Absolutely, Your Honor. Well, I'm not so sure. I get hit by a bus in town, and I put on evidence that one company has 90% of the buses in the town, and the other company has 10% of the buses. So I sue the company that has 90% of the buses, and I put on an expert who says, there's a 90% chance you'll get hit by that company. Can I get to a jury against that company? I think the answer is absolutely yes, Your Honor. I think the better answer for you would be no, because what you want to say, right, is that maybe it's different when we're evaluating defendant's behavior versus plaintiff's behavior. Yes, I agree with that. Because Wal-Mart sort of suggests that the answer should be no to Judge Coyote's question. So you're going to prove liability on the basis of the defendant just based on a guess about whether the defendant did anything. Now, we know the defendant can be proved. It could be wrong, but you've got evidence to show that the defendant's behavior could result in liability. But here, what we're trying to do is figure out what would the plaintiff do in response to that, just like how long would it take to put on the clothes in Tyson. But do you have any authority to suggest that a probabilistic study that concedes that not everyone would behave this way suffices to get you to a jury? Yes, Your Honor. I think the study that was used in Tyson shows exactly that. I don't think that there... That study didn't purport to say, although 90% of the people would take this long, 10% we know wouldn't. That's... He said 100% of the people will take this long. Now, we know that's wrong, but that's what he said. That's what's the puzzle in the case is you have a study in which you're going in saying, I just want you to know 10% of the people are not going to behave this way, but 90% will. Now, if there's some theory by which it makes sense to say that a jury could be doing other than speculating and saying on the basis of that alone, I'm going to say this person must have been in the 90% category. Yes, I think it's a totality of evidence, Your Honor. I think the focus of the questions is obviously on the specific numbers that are presented by Dr. Conte. You're using 90% and 90% likelihood, but that's only one piece of the evidence in this case. There's a much larger body of evidence that comes from defendants' own documents and the statements of their own CEO. It's based on what the consumer would do? Yes, absolutely. What else is there? So the CEO has discussions where he talks about how there's extreme brand loyalty to AZACOL 400, and that it's a large battleship that's almost impossible to move around. So quantify that. Tell us what that means. This does not add to quantification. You're absolutely right, Your Honor. But it does help because at the end of the day, the question is, is it more likely than not that an AZACOL 400 purchaser would have continued purchasing AZACOL 400 but for this misconduct? Suppose you had an individual trial and you put on an expert who said, I've done the study, 51% of the people would have switched, and then you rest. In an individual trial, would the defendant get up, be able to stand up and say to the plaintiff, well, you just heard that testimony. Does that describe you? And the plaintiff would say, well, actually, no, I'm really brand loyal. I wouldn't have switched. This was working great for me. I don't switch to generics, or I hate generics. I've never used generics. The defendant would be able to do that in an individual trial. As you envision this trial, will the defendant be allowed to do that with respect to the class members? Yes, Your Honor, they would, and they have been through depositions. And so how is that going to work? Tell me, how many class members are there? There's four, Your Honor. No, class members. Oh, class members in the thousands. And so is this going to have thousands of people testifying in the trial? No. Again, Your Honor, because I think in this case, the evidence that we have in this case is more than the single expert that says 51%. But I think what you're telling me is they're not going to get to cross-examine the class members on the issue of what the class members were saying. They have that opportunity through all of discovery, and they will have it for the main plaintiff's trial. No, but I'm asking for the class members, so stick with my question. Isn't it true that what you envision is the plaintiffs will not have any opportunity to cross-examine class members at trial? That is correct, Your Honor, because absent class members are not testifying at trial. The main plaintiffs are. They have had the opportunity through discovery. They deposed an absent class member, BCVS Massachusetts in this case, and had the opportunity to ask all the questions like this they want. And that's equally true in Tyson. That's correct. There was no prospect that they were going to be able to cross-examine the class members in Tyson to say, you know, I've got people who say you're very slow, so why would I think that it took you the average time to put your clothes on? That's exactly right, Your Honor, and this dispute goes to the merits. To the extent that the court believes that it's weak evidence, the poor representative evidence, that's something that could be a problem, but I think we're pushing on it. In New Motors, in Hal Burton, in Walmart, sometimes the evidence is so weak that it can't count as the kind of common evidence that can gain cross-predominance. We're trying to figure out whether this is like that, I think, or whether it's better than that, even if it's weak. Understood. What's very hard to get a sense of is what are we supposed to use to evaluate that question, because that's what I'm puzzled by. Yes, Your Honor, and just very briefly, on the evidence of coercion aside from Dr. Conte's report, I do want to note that's Essay 3602 to 10, paragraphs 64 and 95, Essay 363435, paragraphs 195 to 97. There is more in the record here than Dr. Conte to prove coercion. Everything we know about this industry, the systematic effects of state substitution, of formulary management by PBMs and TPPs to drive everyone to utilize generic drugs. There is testimony and documents from defendants. So I think when we're talking about whether or not there's enough to go to trial on this issue of coercion, I think that there is, and it's not just a matter of looking solely at Dr. Conte's quantification. So I think... Counsel, if I might ask my question now. Yes. You opened by saying, in essence, the Galbert ruling by the district court has resolved this matter because she found Dr. Conte's evidence admissible, and that's all it would take to support the class certification order. You've since backtracked from that, and you've said, oh, I'm not just talking about the expert report. I'm also talking about Essay 3602, whatever, various studies. Do those studies actually have any quantification data in them? No, we aren't. Those are qualitative documents. So we've still got the same problem of how we tell who was injured and who wasn't injured. I understand, Your Honor. I don't believe there's a problem in the face of the evidence that answers the question, is it more likely... The expert evidence. Yes, Your Honor. The only expert evidence is Dr. Conte's quantifying. Okay. But I thought we had a role to play here, totally apart from the Galbert issue, that our role was not to assume that Galbert admissibility questions resolve the class action questions. Is that correct? That is correct, Your Honor. That is correct. Just because the Galbert was denied does not mean we automatically are certified under all elements. Okay. Thank you. You referred to the dexium de minimis. Do you have a position on how high the number has to get before it's not de minimis? No, I do not, Your Honor. I read dexium, and I think the way to read de minimis is that de minimis is a functional standard. Sure. Okay. What does that mean? It means, Your Honor, that the question about whether or not there are too many class members, more than de minimis uninjured class members, is a call on a district court in terms of their discretion about whether or not there are so many that makes it unmanageable. The second thing I don't fully understand about this concept of an uninjured class member, when you have a class-wide means of proof, if the class-wide means of proof is accepted by the jury, on your theory, that means the jury found every member of the class would have behaved a certain way. All or virtually all, Your Honor. Yes. And we believe that it does show all. Why do you say virtually all? Sorry, Your Honor, because that's the... You're going to put proof to the jury that you say, in common, that means the jury can find, on the basis of that study alone, that every class member would have purchased the generic. That's correct, Your Honor. Once the jury finds that, how is there any uninjured class member? There's not, Your Honor. Well, you're not, in fact, planning to do that. You told the judge what you're going to do is you're going to put on an expert who's going to say something like some percent less than 100, and so the jury would find most but not all, that's why you keep saying most but not all, were injured, and then this claims administration process, post-verdict, would figure out which ones were uninjured and which were. That's what you proposed to Judge Kasper that she certified. That's the way of substantiating the claims in the allocation stage, yes, Your Honor. But that presumes they'll be uninjured. So your answer to Judge Farron is, no, we're not going to prove everybody was injured. We're going to prove 90-something percent. Yes, Your Honor. At the end of the day, what we're ultimately going to prove through Conti's report because of her qualification. But, you see, there's no case that I know of in which you're allowed to prove, maybe you've got one, in which you go in saying, here's my common means of proof. It doesn't apply to everyone. It's odd. It's normally what you say. Here's my common means of proof, which means it applies to everyone. And then if you win, every number injured numbers. And what the uninjured analysis would be doing up front at the certification stage might be some assessment of how good is this common means of proof, how likely is this to play out, that at the end of the day we have individualized trials, et cetera. But I don't really understand, if you really have a common means of proof, why you would think that post-verdict you're going to have an uninjured class member. What you're going to have is a very good verdict for you. Yes, that's right, Your Honor. I think the next scene is the case. But what Judge Kavanaugh is saying is that you're presenting it now to us as if you're seeking common means of proof. But the way you presented it to Judge Katherine, the way she decided it, was as if you could just put forward 90 percent. And then even though the jury would not have told you who was liable and would have said some are and some aren't, you then sort that out not through a jury trial but through a claims process. That's a very different way of thinking about what's going on here. Yes. Well, we believe that that incident record would allow us to prove that all class members fitting our objective criteria were injured. We believe we have that. Your Honor's verdict says there were uninjured class members. And we have a fact-finding by the district court judge on that. So how do you know that? I think, Your Honor, it's a combination of different elements of Dr. Conte's report. Doesn't Conte say point blank there were uninjured class members? Less than 100 percent in what she has modeled. So less than 100 percent means there were uninjured class members, your own expert says? Yes, Your Honor. Thank you. So I'd like to wrap. I think the district court here did do a thorough and rigorous analysis of the laws and the facts in this case. And we would respectfully request that this court affirm that class certification decision. Thank you, counsel. Obviously, Your Honors, some of the Walhart issues are difficult, and the courts will be wrangling with those for some years. I want to point out some record issues about this case that can allow the panel to deal with the case before today. First, I've been talking about consumer preferences. At the record at S.A. 1466, Dr. Conte testifies, quote, I did not do a full assessment of consumer preferences. There were ways of doing that, but I did not do that. And, again, that's what I'm talking about. You can imagine surveys or econometrics might work for a Tyson-like case or a Walmart case. But here, the evidence is simply not present before the court to proceed on to a jury trial. The second point I would make is going back to Comcast and the disconnect between damages and liability. The liability case has to be an amended case of extreme coercion. Who was extremely coerced? The new drug took DBPL. So the same ingredient that's in water bottles and children's pacifiers has now been taken out of our drug. It was in our drug because it was a plasticizer, and we needed it at the time. We had to invent a new one. But some people didn't care about that remote risk, and they went with our high-dose product, the 800 milligram. So what you have is the consumer damages are limited to those people who are switched. They had to buy the old drug and then the new drug. The insurance class doesn't. It includes all prescriptions, even prescriptions of consumers who are not switched. In addition, the damages are higher because all you have to do is take ASIC, all the way Dr. Conkey does it, the only expert we have to look at in this case. Dr. Conkey will go all the way back to January 2009 or 2010. You used the drug for a little while. Now you're taking Lialda, sold by a competitor. You're not switched by the hard switch. So this is very much unlike the reverse payment cases where we have a brand and a generic. Her methodology, the only thing she does, you will see that she uses brand generic curves where she says in general when a generic is 10 percent the price of a brand over two or three years, people want to save 90 percent. The choice is much more difficult here. You have a safety decision to make. You have a dosage decision to make. Many of us take a lot of pills. If you take a lot of pills, you're worried about pill burden. Some people say to heck with the ASIC all-franchise and go to a pre-sale. So the fact here, and I think a fact determination here is one way of disposing of this case. The thing that just, and I have trouble with this, is a lot of the same points seem like they could be made in Halbert. In fact, they were made by the other judges in BASIC. And the response by the majority in BASIC is not, oh, it's not true that some people won't rely on stock price. They say it's of course true that some people, some people hear the representation, know it's a lie. Some people have political reasons why they're going to dump the stock. There's a thousand different classes. No one could get up and say everyone's going to do this. That didn't seem to move the court at all. And I understand there's a presumption there, and there's no presumption here. I'm trying to figure out why that matters significantly for anything that we should care about in terms of trying to figure out whether this is a common means of proof. The simple answer I think in my mind is if you look at BASIC and at Halliburton, the court there in securities law has its presumption of price effect efficient market hypothesis right for whatever value that is. That's the law that we have in our land. This is state law, so you have your issues. But apart from the presumption point, here and even in Halliburton, if there's proof that the misstatement didn't affect the stock price, then all of a sudden presumption ends and there's no class action and probably no one is ever going to change hands, even if there was fraud. And here we know that the decision was not binary. It was quaternary, and it at least demanded some surveyor econometrics work. The record is devoid of that. For those reasons, Your Honor, the class must be decertified. Thank you. Thank you. Thank you both.